IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WILLIAM D. DUNNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-00074-BLW |
| | ) | |
| D. SMITH, WARDEN, | ) | **MEMORANDUM DECISION** |
| B. AVALOS, ASSOCIATE | ) | **AND ORDER ON DEFENDANTS'** |
| WARDEN, and J. KARGE, | ) | **MOTION FOR SUMMARY** |
| CAPTAIN, | ) | **JUDGMENT** |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## INTRODUCTION

Chief U.S. District Judge Anthony W. Ishii has reassigned this *Bivens* action

brought by a federal prisoner to the undersigned visiting judge.  Currently pending is

Defendants' Motion for Summary Judgment. (Docket No. 30).  Having fully reviewed the

record, the Court finds that the facts and legal arguments are adequately presented in the

briefs and record.  Accordingly, in the interest of avoiding further delay, and because the

Court conclusively finds that the decisional process would not be significantly aided by

oral argument, this matter shall be decided on the record before this Court without oral

argument.[1]

---

[1]  Local Rule 78-230(m) provides that oppositions to summary judgment motions must be served and
filed within 18 days.  While it appears that Dunne did not timely file all of his responses, given the
leniency towards prison inmates acting pro se pursuant to *Tucker v. Carlson*, 925 F.2d 330 (9th Cir.
1991), the Court will evaluate summary judgment on the merits of all relevant filings in support of
or in opposition to the Defendants' Motion for Summary Judgment.  However, Plaintiff is put on
notice that even though he is proceeding pro se, he still must adhere to the procedural rules just like

## BACKGROUND

Plaintiff William Dunne is a federal prisoner who was incarcerated at the United States Penitentiary at Atwater, California (USP Atwater) from March 22, 2002 until he was transferred to another prison on August 11, 2006, where he currently remains.  From January 19, 2006, until January 26, 2006, and again from April 3 to August 11 of that year, Dunne was in the Special Housing Unit (SHU) at USP Atwater. The SHU contains a mix of inmates taken out of the general prison population either on "administrative detention" status or, for punitive reasons, in "disciplinary segregation." Dunne was an administrative detention inmate.

On January 17, 2006, USP Atwater initiated a policy prohibiting inmates in SHU from possessing individual within-cell newspapers and magazines.   The policy provides in pertinent part as follows:

> "[N]ewspapers and magazines are no longer allowed to be possessed by inmates in the Special Housing Unit (SHU).  Possession is prohibited as it presents a threat to security of the housing unit, and a health, fire, and housekeeping hazard…. All newspapers and magazines received will be retained/confiscated by SHU staff and handled according to policy.  Inmates housed in SHU may read printed materials that will be retained in the SHU law library.  The reading material will be rotated periodically by the Education Department.

> Inmates may suspend subscriptions while they are housed in the SHU.  Newspapers and magazines that are delivered to the institution for the inmate will be placed in the SHU Lieutenant's Office.  The printed materials will be inventoried by SHU staff and presented to the inmate for signature.  A…[confiscation form] …will be completed for the newspapers and magazines received by mail. The OIC will ensure the property record or confiscation form is completed and the property, with the form, are placed in the SHU Lieutenants Office [sic].

---

a counseled litigant.  *See King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987).

The non-issued (or confiscated) newspaper and magazines will be retained in the inmate's property and held for 120 days.  The inmate may also mail out or donate the printed materials." (Karge Decl. Attach. 5).

Defendants allege that this policy was implemented by prison officials because of on-going problems with newspapers and magazines in the SHU.  In addition, in order to use the SHU law library inmates had to request access to it, and were limited to using it for one-hour periods. (Compl. Ex. 4).  There is no indication in the record as to the number of times an inmate would be permitted to use the law library while in the SHU.

In his complaint, Dunne claims that prison officials violated his First and Fifth Amendment rights when they confiscated incoming publications in the absence of a reasonable relationship to a penological interest.  Specifically, Dunne alleges that the four months in which he was held in the SHU he was not given any of the newspapers or magazines to which he had previously subscribed. He contends that despite his repeated requests for access to reading material, he was permitted to go only once  to a small room that served as a makeshift law library.  Although he admits he was permitted to stay twenty minutes longer than permitted by SHU Rules, he alleges that no newspapers or magazines were ever available.  Moreover, he states that he was denied due process because he could not alternatively mail out or suspend his subscriptions while he was housed in the SHU.

Based on these allegations, Dunne sued Warden Smith, Associate Warden Avalos, and Captain J. Karge for violations of his First, Fifth, and Eighth Amendment rights.[2]

---

[2]  All defendants in this action currently work for the Bureau of Prisons in other capacities. Defendant Smith is currently serving as Warden at USP Atwater.  Defendant Avalos is the Associate Warden

Dunne alleges that Smith ordered the ban on newspapers and magazines in the SHU, that Avalos wrote the memorandum promulgating that policy, and that Karge implemented the policy.  The Defendants filed a motion to dismiss wherein they requested dismissal based on lack of subject matter jurisdiction, failure to state a claim upon which relief may be granted, and on the ground of qualified immunity.  The Court granted in part and denied in part the motion to dismiss. (*See* Mem. Decision & Order, Docket No. 27).

Specifically, the Court dismissed Dunne's claims against the Defendants in their official capacities for injunctive and declaratory relief, as well as his claim under the Eighth Amendment.  However, the Court denied the motion insofar as Dunne stated a claim against the Defendants in their individual capacities for monetary damages under the First and Fifth Amendment, and denied the motion on grounds of qualified immunity, however, without prejudice. Defendants now bring a Motion for Summary Judgment, which Dunne has responded to, and the matter is now ripe for review.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is "not a

---

at the FCI-I in Victorville, California.  And Defendant Karge currently serves as the Correctional Services Specialist at the Western Regional Office in Dublin, California.

disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. The availability of summary judgment turns on whether there is a proper question for the judge or jury to resolve the parties' differing versions of the truth. *Anderson v. Liberty Lobby, In.c.* 477 U.S. 242, 248 (1986).

"[T]he mere existence of some alleged factual dispute between the parties [however] will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id*. at 247-48. Only facts which are material—those which may affect the outcome of the case—are relevant. *Id*. at 248. And any dispute over a material fact must be "genuine"—that is, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

The burden rests on the party seeking summary judgment to show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325; *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (holding same). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does, in fact, exist. *Anderson*, 477 U.S. at 256.

Thus, this Court must determine whether Dunne has, "by affidavits or otherwise" as provided in Rule 56, "set forth specific facts showing . . . a genuine issue for trial." Rule 56(e). The evidence must be viewed in the light most favorable to Dunne, and the Court must not make credibility findings. *Anderson*, 477 U.S. at 255. Moreover, direct testimony of Dunne must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999); *see also Adickes v. SH Kress & Co.*, 398 U.S. 144, 148-49 (1970) (holding that courts should view the evidence and any inferences that may be drawn from in the light most favorable to the non-moving party). The Court must also be "guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255. However, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Although inferences from disputed facts must be drawn in Dunne's favor, deference must be accorded prison authorities' views with respect to matters of professional judgment. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Deference, however, "does not mean accepting the prison officials' conclusions." *Fontroy v. Beard*, 2007 WL 1810690, at *3 (E.D. Pa. June 21, 2007); *see also Casey v. Lewis*, 4 F.3d 1516, 1535 (9th Cir. 1993) (citations omitted) (holding that "deference does not mean abdication"). Rather, there must be a basis for the officials' exercise of their judgment and the Court must determine if the defendants' conclusions are in fact supported by the evidence. *Id*.

## DISCUSSION

This case concerns a prison inmate's First and Fifth Amendment rights. Only Dunne's First and Fifth Amendment claims currently remain, but because both claims are governed by the test announced in *Turner*, discussed below, Dunne's Fifth Amendment claim will be subsumed by the First Amendment claim.[3]

## A. Validity of Prison Regulations Under *Turner*

Prisoners enjoy a First Amendment right to send and receive mail. *Ashker v. Schwarzenegger*, 2009 WL 801557, at * 6 (N.D. Cal. Mar. 25, 2009) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)). However, a prison may adopt regulations or practices which impinge on a prisoner's rights if the regulations or practices are "reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89 (1987).

In determining whether a prison regulation is valid, i.e., whether it is "reasonably related to legitimate penological interests," four factors must be considered: (1) whether there is a "rational connection between the prison regulation and a legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the rights that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates

---

[3]    With respect to Dunne's Fifth Amendment claim, Dunne argues that confiscation of his magazines and newspapers "arbitrarily deprived him of a fundamental liberty interest." (Mem. Decision & Order). The Court previously noted that "[t]his appears to be a 'substantive due process theory,' and must be viewed through the *Turner* lens because the *Turner* analysis 'applies to all circumstances in which the needs of prison administration implicate constitutional rights.' *Washington v. Harper*, 494 U.S, 210, 224 (1990); (Mem. Decision & Order).

and on the allocation of prison resources generally"; and (4) whether "ready alternatives" exist. *Id*. at 89-90.

### 1. Rational Relationship to Penological Interest

The first factor under *Turner* is multifold. *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).   First, the Court must determine whether the governmental objective underlying the regulation at issue is legitimate and neutral; and second, whether the regulation is rationally related to that objective. *Id*.; *see also Beard v. Banks*, 548 U.S. 521, 533-535 (2006) (holding that the Court must determine not only whether the Defendants' evidence shows a logical relation, but also whether it shows a reasonable relationship to the penological objective).

In analyzing this first *Turner* factor, the Court must inquire as to whether the prison policy restricting a prisoner's First Amendment rights operate in a neutral fashion, i.e., without regard to the content of the expression. *Thornburgh*, 490 U.S. at 414 (citing *Turner*, 482 U.S. at 90).  Defendants in this case contend that the policy at issue is neutral and the Court agrees.   The policy prohibits SHU inmates from possession of all newspapers and magazines, regardless of their content.  In addition, the policy applies to all inmates housed in the SHU.  Thus, the Court finds that the neutrality issue is satisfied.

Next, the Court must consider whether the prison ban on magazines and newspaper subscriptions is logically and rationally related to Defendants' underlying objective.  Defendants contend that the prison policy furthers penological interests of "security, sanitation, and safety."   This Court previously stated however, that mere conclusory objectives are insufficient to reasonably connect the rationales. (*See* Mem.

Decision & Order 10-11).  While Defendants failed to present evidence that "put[ ] flesh on the bones of the 'security, sanitation, and safety' rationale" at the motion to dismiss stage, the Court recognizes that the Defendants have now presented the Court with more than mere conclusions. Specifically, Defendants support their motion with a detailed declaration by Defendant Karge, and have also provided two photographs of weapons made from magazines and newspapers, and a copy of the prison memorandum implementing the policy at issue.

The Court previously stated that, "it has no qualms nor disputes that the Court must "accord substantial deference to the professional judgment of [corrections] administrators" in reviewing regulations. (Mem. Decision & Order 9; citing *Overton*, 539 U.S. at 132.) In fact, this Court recognizes that "running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources. . ." *Turner*, 482 U.S. at 85.

Defendants had a legitimate concern about safety and security in SHU because not only were fires being set in the SHU cells using newspapers and magazines, but weapons were being made out of these materials as well.  According to Karge, newspapers and magazines were a particular problem in the SHU.  (Karge Decl. 8).  Karge asserts that in approximately August of 2005, a number of security issues arose in SHU relating to inmates' possession of newspapers and magazines. (Karge Decl. 4). For example, according to Defendants, newspapers and magazines were used by inmates in SHU to start fires, make and use weapons or body armor, cover cell windows, and cause sanitation problems.  (Def.'s Mem. P. & A. 10; Karge Decl. 4-5).

Specifically, Karge contends that the inmates used the newspapers and magazines to cover the windows of cell doors, and also cell walls, using toothpaste as an adhesive. (Karge Decl. 5). This was a security problem because it blocked the ability of officers to observe inner-cell activity and maintain a positive count of inmates.  Moreover, this was a sanitation issue because the toothpaste adhesives needed to be scraped off and would often peel off the wall paint, and would invite mold, pests, and other vermin. (Karge Decl. 7)  In addition, the false walls were a security threat because they could be used to hide weapons, or other paraphernalia and contraband.  (Karge Decl. 7).

SHU inmates were apparently using the newspapers and magazines to make weapons as well.  Prison officials confiscated two weapons made by SHU inmates: (1) a pair of nanchukas made of tightly rolled magazines tied together and wrapped with strips of cloth torn from a bed sheet; (2) and a sharp spear-like weapon made with newspaper covered in melted plastic food wrappings.  Photos of these weapons were attached to Karge's testimony. (Karge Decl. Attach. 3-4).  Also according to Karge, the inmates used magazines and newspapers to create paper-mache like body armor. (Karge Decl. 5).

According to Defendants, these incidents were reported, and weapons were confiscated, shortly before the policy at issue was imposed. "The policy thus sought to address on-going problems and prevent future problems posed by individual within-cell possession of newspapers and magazines in the SHU." (Def.'s Mem. of P. & A. 10; Karge Decl. 8). It is reasonable to assume that prisons must limit the amount of material in an inmate's cell due to fire hazards, flooding of toilets and sinks, hiding contraband, and the making of weapons, et cetera. *See e.g. Crime, Justice & Am., Inc. v. McGinness*,

2009 WL 2390761, at *6 (E.D. Cal. Aug. 3, 2009) (noting justifications for prison regulation); *Prison Legal News v. Chesire*, 2006 WL 1868307, at *6 (D. Utah June 30, 2006) (stating that a jail must further limit the amount of subscriptions in an inmate's cell for the same reasons); *cf. Prison Legal News v. Lehman*, 397 F.3d 692, 700 (9th Cir. 2005) (irrational to prohibit inmate receipt of bulk rate mail and catalogs on the theory that it reduces fire hazards because the quantity of possessions that prisoners may have in their cells were already regulated). Moreover, a few courts have held that officials need not demonstrate an "actual danger in order to support the reasonableness of their determinations. It is enough to show that a potential danger exists." *Cheshire*, 2006 WL 1868307, at *6 (citing *Espinoza v. Wilson*, 814 F.2d 1093, 1097-98 (6th Cir. 1987).

Dunne opposes the motion for summary judgment. He maintains his position that no rational relationship exists between the Defendants' objective and the policy restricting his First Amendment rights, and denies their claim that there were a number of security issues, including the creation of false walls, the setting for fires, or that weapons were being made. He counters by noting that Defendants have failed to supply incident reports, disciplinary hearing officer findings or emergency response reports, aside from the two photos of what Dunne refers to as "meager weapons" that are needed to support the policy. (Opp. to Karge Decl. 3-4).

Dunne also opines that the presence of those "meager weapons" merely suggests a need to exercise control over other materials, not newspapers or magazines themselves. In his opposition, Dunne refutes testimony regarding Karge's observation of inmates covering their cell door windows with newspapers and magazines and toothpaste. (Opp.

4).  According to Dunne, if the guards saw anything of that nature during their half hourly checks, they would order the material to be removed. (Opp. 4). Dunne also counters that Karge gave no comparison of window covering incidents between disciplinary segregation prisoners and administrative detention prisoners and the number of cell window covering incidents. (Opp. 4-5). However, from the Court's perspective, this appears only to affirm the security risk presented by Defendants. Dunne posits that even if there were such incidents, the ban is an exaggerated response if the incidents were "just a few…in the four year history of USP Atwater…" and thus would render the ban unconstitutional. (Opp. 5). Yet, whether there is a reasonable and rational legitimate penological interest underlying the objective may not necessarily turn on the number of incidents.

       With respect to the paper-mache body armor, Dunne states he "has never heard of them being used in confrontations with the staff. [That] [i]t is just not that useful given the weapons staff use." (Opp. 5). However, just because Dunne is unaware of such a use in his "30 plus years in the prison system" does not mean its presence is not there. (Opp. 5).

       Dunne argues that Defendants' concerns of the fires must be a post hoc rationalization, given other flammable materials, such as clothing, bedding, legal work, religious materials, and photographs, which were still permitted in prisoners' cells even after the ban.  According to Defendants, the inmates treat newspapers and magazines as "disposable property." Dunne counters, on the other hand, that newspapers and magazines are the type of personal belongings that inmates value rather than government issued

materials such as toilet paper and bedding, and thus that prisoners would be more inclined to burn government issued materials rather than personal materials such as newspapers and magazines, because government materials are replaced immediately. (Opp. 10-11).

Although it appears that other flammable items could also be used to ignite and cause fires in the same manner, the Court notes that such materials are not the type of materials that were reported as actually used to create weapons and start fires. In fact, all of the testimony presented relates to problems and issues with respect to newspapers and magazines specifically. The Court also notes that, at Dunne's suggestion, while it could be more useful to take away the batteries used to start the fires, it is not the job of the Court to implement prison policy and procedure or to second guess prison authorities.

Finally, Dunne argues that inmates are entitled newspapers and magazines in other SHUs at other federal prisons. Thus, he contends that because the alleged problems exist in all federal prison SHUs, the value of the possession is outweighed by the risks given the national policy permitting magazine and newspaper possession by SHU prisoners. (Opp. 3-4). However, "the Constitution does not mandate a lowest common denominator security standard." *Turner*, 482 U.S. at 93. That is, "a practice permitted at one penal institution" does not mean that it "must be permitted at all institutions." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 554 (1979)). Given the deference courts must accord to prison authorities, the Court finds that the Defendants have put forth sufficient evidence that now puts flesh on the bones of the "security, sanitation, and safety" rationale, which was otherwise lacking in earlier proceedings. Accordingly, the policy restricting newspapers

and magazines from inmate cells in the SHU is rationally related to a valid penological interest and the first factor has been satisfied by Defendants.

### 2. Alternative Means of Exercising a Right

The second *Turner* factor inquires as to whether there are "alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90.  This translates to whether or not there was *access* to newspaper and magazine alternatives. The absence of any alternative may provide evidence that a prison regulation is unreasonable, however, it is not conclusive of the reasonableness of the policy. *Beard*, 548 U.S. at 532 (citing *Overton*, 539 U.S. at 135). Furthermore, while alternatives must be available, they "need not be ideal." *Overton* at 135; *see also Cheshire*, 2006 WL 1868307, at *7 (citing same and holding that a ban on newspapers and magazines as applied was unconstitutional because the prison did not provide access to periodicals through a library). In the context of the present case, access to alternatives includes having both access to the type of materials as well as reasonable physical access to the materials.  Dunne also claims he was prevented from suspending his subscriptions while he was in SHU.

### a) Access to Materials

"Prison officials have broad discretion [in] determin[ing] what publications may enter a prison." *Ashker*, 2009 WL 801557, at *11 (citing *Thornburgh*, 490 U.S. at 416). The Supreme Court has held that "alternative means" is sufficient and/or satisfied where "other means of expression remain available." *Thornburgh*, 490 U.S. at 418 (also holding

that a regulation which permits a broad range of publications to be sent, received, and read, satisfies the second *Turner* factor).

In this case, alternative means of expression were available to Dunne.  The policy here provided that "[i]nmates housed in SHU may read printed materials that will be retained in the SHU law library [and that] [th]e reading material will be rotated periodically by the Education Department." (Karge Decl. Attach. 5).  Dunne argues, however, that access was inadequate, pointing out that the policy memorandum "directs SHU staff to deny SHU prisoners magazines and newspapers sent to them . . . but does not direct them to otherwise make them available." (P's Opp. to Def.'s Notice of Mot. & Mot. Summ. J. 4).

The Court finds the policy memorandum, however, provides exactly what Dunne contends it does not.  In fact, according to Karge inmates could "request reading material, including newspapers and magazines, from [the SHU law library] and/or from the Education Department." (Karge Decl. 9).  The Court has found no testimony that Dunne specifically requested to read newspapers and magazines; rather, Dunne only requested to "use the law library the next time it is available." (Compl. Ex. 3).

Dunne acknowledges that the library contained reading material: a few old Sheppard's supplements, an old index to the U.S. Codes Annotated, etc. . . .and less than a dozen novels." (Opp. to Karge Decl. 12). Dunne's argument that access was unavailable, at most, suggests that the prison officials failed to specify whether access to "reading material" in their policy memorandum was to include newspapers or magazines, or other non-legal materials aside from the novels. Although Dunne apparently was

unsatisfied with the selection accorded to him, the availability of other reading materials to be read was present. While these periodicals may not be "ideal" reading material (in comparison to Dunne's newspaper and magazine subscriptions), they are alternatives nonetheless.

Moreover, Dunne fails to allege that he requested newspapers and magazines from the Education Department and they were not provided.  There is simply no evidence submitted by Dunne that his requests for specific reading materials allowed under the policy were denied.

### b) Actual Access to the SHU law library

Although the Court finds that alternative reading material was available, there is a question as to whether actual access to these alternative materials was present. It would not make sense to provide alternative means to reading material through a library if the inmate does not have reasonable access to the library.   The policy at issue provided that inmates could read printed materials in the SHU law library.

According to Dunne, the "SHU law library" was a makeshift library, consisting of merely an empty holding cell or utility room containing "obsolete cast-offs from the institution law library."  (Compl. Attach. Aff. 4). He also states that no newspapers or magazines were actually provided or stored there.  (Opp. to Karge Decl. 12).

Neither the policy memorandum nor the SHU Rules states how frequently inmates may use the SHU law library for reading, only that it may be used for one-hour periods. (*See* Karge Decl. Attach. 5; Compl. Ex. 4).   According to Dunne, he wrote numerous requests to obtain access to the SHU law library.  However, despite repeated requests,

Dunne maintains he was permitted to access this resource on only one occasion during his four months April to August he was housed in the SHU unit.   Copies of the written requests have not been provided, but for purposes of the motion for summary judgment, the Court will view the facts in a light favorable to Plaintiff.  On that one occasion, Dunne claims he did not see any newspapers or magazines, nor were any made available to him. (Opp. 12). He also asserts that he never saw anyone being provided such access, nor heard of anyone obtaining such access. (Opp. 12).   Dunne fails to assert or establish whether any SHU inmate requested any newspapers or magazines.

Defendants do not challenge Dunne's alleged singular access to the library or that Plaintiff made multiple requests to use the library while in the SHU unit.   Defendants have failed to provide any evidence to the contrary. At the most, Defendants argue that "Plaintiff concedes he did have opportunity to view some reading material in the SHU law library" but does not counter Dunne's assertions that while *some* reading material was available, newspapers and magazines (which the ban applies to) was not.    (Def's Mem. of P. & A. 11).   Nor do Defendants provide information of whether Dunne requested newspapers or magazines normally available from the Education Department. Defendants do not have an obligation to second guess what reading materials inmates may want to read, Defendants merely need to provide a process for inmates to get the available materials they properly request from the Education Department.   Not all requested newspapers and magazines need to be provided, only those periodicals normally available from the Education Department.

Nor do Defendants refute that Dunne was allowed to visit the law library on more than one occasion although he allegedly made numerous written requests to do so.  In a prison context, access must involve both the materials themselves and the ability to get to the materials.  The Court finds it hard to believe that permitting Dunne to use the SHU law library one time during the four months he was housed in the SHU is reasonable or can even be considered adequate access to allow an inmate to exercise his First Amendment rights.

### c) Suspending, Donating or Mailing Inmate Subscriptions

Dunne also appears to be complaining about restricted access due to the prison policy that allowed inmates with subscriptions to suspend, donate or pay to mail the materials to others.  Under the policy, confiscated newspaper and magazines were to be held in the SHU Lieutenant's Office for 120 days.  If the inmate was still in the SHU, he had the option of mailing out, donating, or suspending his subscriptions.  Dunne contends that he could not mail out the materials because he lacked the required postage.  He also claims he was prevented from taking possession of the confiscated subscriptions when he was released from SHU because a transferring inmate cannot take periodicals with them.  This does not create an impediment to actual access, despite Dunne's contentions.  Dunne may have personally lacked the means to mail out his subscriptions, but his inability to buy postage does not affect actual access.

Dunne does not assert that he tried to donate his newspapers and magazines.  Defendants do not say whether the confiscated materials could have been donated to the SHU law library, where Dunne may have been able to access his subscriptions.

Dunne asserts that he tried to suspend his subscriptions while he was housed in SHU.  However, he states that Defendants would not provide him with the publisher information necessary to effect a suspension.  Defendants do not refute or counter this contention.   By not providing Dunne with the tools necessary to suspend his subscriptions, Defendants in effect blocked access to an alternative means to which Dunne is entitled after he was released from SHU.

The Court finds genuine issues of material fact exist that prevent the Court from making a determination on whether or not the second factor of providing alternative means has been satisfied by Defendants.  While Defendants did provide reading materials and the ability to request other materials under the policy, the record at this stage seems to establish very limited access on the part of Dunne to go to the library to read materials even after making numerous requests.  The limited physical access to the law library and reading materials possibly defeats the alternative means provided from satisfying the second *Turner* factor and prevents summary judgment from being granted in Defendants' favor at this time.  Finally, the Defendants alleged failure to allow Dunne to suspend his subscriptions may create a road block to having an effective alternative means for SHU inmates to exercise their First Amendment rights.

### 3.  Third & Fourth *Turner* Factors

As to the third and fourth *Turner* factors, Defendants rely on their analysis that because alternative means were available by accessing the SHU law library, impact on correctional officers, and/or absence of ready alternatives are (arguably) not applicable. In this case, the Court has carefully considered Dunne's claims and have viewed all of the

facts in a light most favorable to Dunne.  Although the Court finds that the policy is a valid regulation insofar as it was not an exaggerated response, there is a genuine issue of material fact as to whether alternative means and/or access to these means were in fact available to Dunne.  Because the Court finds a genuine issue as to whether alternative means did exist, it need not address the third and fourth *Turner* factors.  Thus, the Court finds that in light of the foregoing, summary judgment is not appropriate and is therefore denied.

## QUALIFIED IMMUNITY

This Court previously denied Defendants' request for dismissal on grounds of qualified immunity, but allowed the defense to be reasserted in a motion for summary judgment.  (Mem. Decision & Order 2).  Defendants have reasserted this defense in their motion for summary judgment.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson* at 815.

A government officer is not protected by qualified immunity if he violates a clearly established constitutional right.  *Phillips v. Hust*, 588 F.3d 652, 657 (9th Cir.

2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (stating that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

When reviewing a motion for summary judgment based on qualified immunity, the Court must "assume that the version of the facts asserted by the non-moving party is correct." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 942 (9th Cir. 2003).   Thus, all factual disputes will be resolved in Dunne's favor.  Viewing the evidence in a light most favorable to Dunne, the Court must decide two questions: first, did defendants' actions violate the Constitution; and second, assuming a constitutional violation, was the right clearly established at the time defendants' acted that would preclude a qualified immunity defense. *Pearson,* 129 S.Ct.  at 818. This Court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.  *Id*. It was not always the case. Prior to *Pearson*, courts were required to analyze qualified immunity protection under the *Saucier* two-step analysis.  *Id*. (holding *Saucier* protocol no longer mandatory, but often beneficial).

The relevant, dispositive inquiry is whether, in the specific context of the case, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* at 202.   This inquiry also turns on "what the officer reasonably

understood his powers and responsibilities to be, when he acted, under clearly established standards." *Saucier*, 533 U.S. at 208. Thus, the precise question now before the Court is whether a reasonable prison official would believe that denying any and all access to magazines and newspapers violates an inmate's right to free speech.

In his complaint, Dunne claims that prison officials violated his First and Fifth Amendment rights when they confiscated incoming publications in the absence of a reasonable relationship to a penological interest. *See e.g. Pell v. Procunier*, 417 U.S. 817, 822 (1974) (recognizing a qualified First Amendment right in prison). The Court again notes that this right was clearly established when the policy was enforced against Dunne. (Mem. Decision & Order 18). Dunne argues, and the Court agrees, that a reasonable officer would and should believe denying access could violate an inmate's rights. If Dunne can establish that his constitutional rights were violated when Defendants denied him physical access to the library on numerous occasions, only allowed him to use the library once in four months and failed to allow him to suspend his subscriptions while in SHU, the Court finds the prison officials should have known they would be violating an inmate's clearly established constitutional rights and would not be entitled to a qualified immunity defense.

Again, Defendants "place too much emphasis on *Beard*" and "overstate Beard's sweep." (Mem. Decision & Order 19). The policy at issue in this case came into effect long before the *Beard* decision was issued. (Mem. Decision & Order 19). The Court re-adopts and incorporates its previous ruling that 'it would be difficult to claim that the Defendants were relying on *Beard* when the Supreme Court's opinion had not yet been

released.' (Mem. Decision & Order 19). This Court finds the Supreme Court did not hold that prison officials may ban newspapers and magazines in all segregated housing units, regardless of the reasons for inmate placement.  The Court is not persuaded by the Defendants conclusory statements regarding their entitlement to qualified immunity and as such, denies summary judgment on this defense at this stage of the litigation based on the disputed issues of fact regarding the alleged constitutional violations.

## Order

Being fully advised in the premises, the Court hereby orders that Defendants' Motion for Summary Judgment (Docket No. 30) is **DENIED**.

IT IS FURTHER ORDERED that Defendants' Motion for Stay in Discovery (Docket No. 29) is **GRANTED** and Defendants shall have forty-five (45) days after receipt of the Court's ruling in this Memorandum Decision and Order to respond to Plaintiff's discovery requests previously filed.

IT IS FURTHER ORDERED that the parties shall participate in a telephonic mediation conference with Magistrate Judge Larry M. Boyle.  Judge Boyle's chambers will contact the parties regarding the scheduling of the telephonic mediation conference.

DATED:  **March 31, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge